18682

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT,
Appellant, v. RURAL LAND COMPANY, Inc., Respondent

(156 S. E. (2d) 333)

*Messrs. Daniel R. McLeod, Attorney General,* and *C. T. Goolsby, Jr., Assistant Attorney General,* of Columbia and *Isadore Bogoslow,* of Walterboro, *for Appellant,*

14

*Messrs. Dowling, Dowling, Sanders & Dukes,* of Beaufort and *Clyde A. Eltzroth,* of Hampton, *for Respondent,*

July 27, 1967.

BUSSEY, Justice.

This is an appeal by the State Highway Department in a rather complex and involved condemnation case, the trial of which consumed three days of a special term of court, called for the purpose of such trial in Hampton County, commencing on May 30, 1966. The printed transcript of record contains slightly less than four hundred pages. The exhibits are numerous and at least some of them bulky and complex. The verdict in favor of the landowner was in the amount of $129,835.00.

On October 19, 1965, the Department condemned 90.5 acres of land belonging to the Rural Land Company, a South Carolina corporation, for the purpose of constructing I-95, a controlled access highway. The subject property, formerly known as the Kress Plantation and latterly as Buckfield Plantation, contained approximately 10,500 acres, and is located west of U. S. Route 17, about three miles south of Yemassee, South Carolina. Buckfield embraces portions of three counties, Beaufort, Hampton and Jasper; however, most of its acres are situated in the latter two. At the time of the condemnation the property was being devoted chiefly to an extensive beef cattle operation, there being on the plantation some 2,600 head of cattle. The right of way extends for a distance of approximately two and one-third miles across the extreme southeast section of the plantation,

running diagonally in a north-south direction across the main line of the Atlantic Coast Line Railroad, at a point about three-fourths of a mile from the southern boundary of the plantation. As a result, the plantation was cut into several tracts, with three tracts being separated from the main portion of the plantation. One of these tracts lies east of the highway and west of the railroad and contains 484.3 acres, more or less, which we shall, for convenience, designate as Tract A. Another severed tract, which we shall designate as Tract B, contains 122.9 acres, more or less, and lies to the east of the railroad but southwest of the highway. Another severed tract contains approximately 165.7 acres, and lies to the east of both the highway and the railroad, but there is no substantial controversy as to this tract.

Several months before the trial, construction plans were requested by the landowner from the Department. Plans were furnished, and by letter the landowner was informed that there was no construction contemplated on adjoining property, either to the south or north, that would have any bearing on the landowner's damages. Due to the complex nature of the case, a pretrial conference was held on May 21, 1966, in Hampton, with the trial judge and all counsel present. The Department's counsel presented a set of construction plans and requested a stipulation to the effect that such could be introduced as the construction plans, without formal proof. An examination revealed that the plans presented were similar in every detail with the plans previously furnished to the landowner. It was then agreed that such plans would constitute the basis for the trial. Additionally, the date when the taking occurred, the acreage condemned and the fact that no benefits accrued to the landowner because of the construction were stipulated. At the suggestion of the trial judge, a further conference was held in Columbia on May 27th, and was attended by the landowner's agents, attorneys and appraisers, the Department's officials, engineers, attorneys and appraisers, as well as representatives of the United States Bureau of Public Roads. At that

time, the landowner presented all of its proposed exhibits, which included maps, plats, pictures and plans. The landowner also requested that several changes be made in construction so that its damages could be diminished, but such changes were rejected by the Department. Its engineers did suggest that some other changes might be made in the course of construction, but no written plans showing any alterations, changes, modifications or additions were furnished the landowner prior to trial, although requested by its attorneys.

It is obvious from the record that both the landowner and the Department devoted a great deal of time and expense to the respective appraisals and preparation for trial. The engineers and appraisers who testified for both the Department and the landowner evidenly spent many days in the preparation of their respective appraisals. The lowest appraisal of damages on behalf of the Department was in the amount of $28,300.00, while the highest was in the amount of $45,-300.00. Appraisals on behalf of the landowner ran from $134,057.50, to $219,160.00.

A further description of the plantation and its use prior to the condemnation is indicated to throw light on the issues. The upper reaches of the Pocataligo River cross the northern portion of the plantation. A portion of the plantation, containing somewhat more than one thousand acres, was tile drained and at one time used as a bulb farm. In addition to being title drained, this area was connected with the upper reaches of the river by a series of canals and flood gates whereby the area could be not only drained, but irrigated. While the landowner had other pasture area, the tile drained area was its prime pasture land, and, according to the evidence, probably the best pasture land in the state.

The new highway intersects this tile drained area, as well as one or more of the canals serving the same, leaving 246 acres thereof, known as the heifer pasture, lying in Tract A to the east of the highway. This pasture normally and ade-

quately sustained 250 head of cattle. Also contained in Tract A is a Coastal Bermuda hayfield.

All of the buildings on the plantation, including the hay barns and the cutting pens, where the cattle are brought for treatment and spraying at frequent intervals, lie to the west of the new highway. Prior to the condemnation, the heifer pasture and the hayfield in Tract A were readily accessible to the cutting pens, barns, etc. by a lane or fenced roadway, thirty-five feet in width and some one-half mile in length, that will be eliminated by the construction of the highway.

The only possible access to Tract A, shown on the Department plans furnished the landowner and agreed upon as a basis for the trial, was a 10' x 10' box culvert, 162 feet in length, underneath the highway at a point approximately one-quarter of a mile south of the heifer pasture. The said culvert is located in a low, swampy area with the bottom thereof being some two feet below ground level, flowage through this culvert being from west to east. The plans showed concrete berm ditches to the west of and parallel to the highway leading into the western end of the culvert, and also a concrete berm ditch to the east of the right of way draining northward in the direction of and to an existing canal or ditch some feet north of the eastern end of the culvert. All of these concrete berm ditches were shown as six feet in width at the top and two feet in width at the bottom. Tract A is triangular in shape and the southern apex of this triangle is approximately one mile south of the box culvert, such apex being at the location where the highway crosses the railroad on an overpass. A rerouted entrance from Highway 17 into the main part of the plantation is located adjacent to the railroad track, underneath the overpass, but Tract A does not border upon this entrance road, being separated therefrom by the respective rights of way of the highway and the railroad.

Tract B contained, *inter alia,* a 41 acre Coastal Bermuda hayfield, and the plans agreed upon as a basis for the trial showed this tract without any means of access whatever. It

might not be amiss to point out the principal reasons for the wide variance between the Department's appraisals and those of the landowner. The Department's appraisers considered that there was no severance damage to the main tract; that access could be obtained to Tract B by a new additional crossing over the railroad, and that access to Tract A could be obtained by building a road across the railroad right of way into Tract A at the southern apex thereof. One of the Department's appraisers testified that he knew of his own knowledge that the necessary permission from the railroad could be obtained.

Appraisals for the landowner were predicated on severance damage to the main tract; lack of any access to Tract B; and lack of any access to Tract A other than the box culvert, which was not regarded as being satisfactorily useable even for a cattle pass, due to its dimensions, elevation and location. There was uncontradicted evidence that the culvert is too small for the passage of equipment regularly used by the landowner. The evidence further reflects that, even with permission from the railroad for an entrance at the southern apex of Tract A, in order to connect such with the heifer pasture and hayfield, roads, fences, etc. would have to be constructed, and the cattle equipment, etc. would have to be moved a distance of approximately three miles in going either to or from the barns, cutting pens, etc., as opposed to a former distance of approximately half a mile.

In the course of the trial, the Department sought to introduce evidence showing various changes and modifications in the plans. The court excluded this evidence because the plans used in the pretrial conferences and agreed upon as a basis for the trial did not reflect such alterations or changes, and the landowner did not have the benefit of such until after the trial commenced. Considerable testimony was taken thereabout in the absence of the jury, and, after his Honor's ruling, the Department made a motion for a mistrial, which motion was refused. His Honor's rulings in this respect form the main basis for the Department's appeal.

We proceed to consider the principal matters excluded from the consideration of the jury. With respect to Tract B, the Department offered an exhibit showing contemplated construction on land to the south of Buckfield Plantation, on which a frontage road was shown extending from an interchange some distance south of Buckfield to the southern boundary of Tract B. Such exhibit had not been furnished to the landowner prior to the trial, and to the contrary, the landowner was advised in writing that no construction was proposed south of Buckfield that would have any bearing whatever on the damages sustained by the landowner. The Department offered no evidence as to the length of the circuitous route by which access to Tract B, from the main plantation, could be gained over such frontage road, but it is obvious from the exhibits in the record that the distance would be several miles. No evidence was proffered by the Department as to the extent of diminution of damages to Tract B as a result of the access attempted to be shown. It would appear that not even the department's appraisers were aware, prior to the time of the trial, that any access to Tract B was contemplated by the Department, via this frontage road. Such was not even considered in their respective appraisals, they simply assuming that access could be obtained by a crossing over the railroad.

The Department sought to introduce an exhibit showing the construction of an entrance road into the southern apex of Tract A at least partially over the right of way of the railroad. The witness through whom this exhibit was proffered testified that he had oral assurance from a representative of the railroad that the construction of such entrance would be permitted by the railroad. No deed or other official document, however, had been obtained from the railroad with respect to either this entrance or the crossing into Tract B assumed and contemplated by the Department's appraisers.

The same witness testified, in the absence of the jury, that there was an error in the plans with respect to the berm ditches shown in connection with the box culvert flowing

into Tract A; that one of the berm ditches to the west of the highway was to be eliminated and a pipe was to be laid across the eastern exit of the culvert for some distance, in lieu of the berm ditch. Admittedly, no plans showing any changes with respect to the berm ditches had even been prepared, let alone furnished to the landowner or any of the appraisers. No evidence was proffered tending to show just how, or the extent to which, damages would be diminished by the changes in the berm ditches.

Other excluded evidence proffered by the Department had to do with the extent of fencing contemplated along the right of way. From the record it appears that there was some temporary fencing in connection with clearing and construction in order to keep the cattle contained. It is not clear from either the proffered exhibit, or the testimony of the witness proffering the same, just what fencing was shown on the excluded exhibit, and one inference from the testimony is that it showed only temporary fencing. The exhibit was not prepared by him or under his supervision, and the remainder of his proffered testimony was far from clear as to just how much permanent fencing would actually be erected. Aside from the grounds on which this evidence was excluded, it might well have been excluded as entirely too vague and uncertain to be of any real probative value on the issue of damages. Witnesses for both the Department and the landowner, in the presence of the jury, had already, without objection, referred to some permanent fencing along the right of way, one of the Department's witnesses having testified to the effect that the whole was to be fenced.

The Department contends that the trial judge erred in excluding the evidence, hereinabove discussed, and that he further erred in refusing its motion for a mistrial. The purpose of the motion for a mistrial was, of course, to effect a continuance of the trial, until a later date, so that the issue of damages could be determined in the light of the changes and additions, proposed by the Department in the course of the trial, rather than being determined upon the plans which

were submitted prior to the trial and agreed upon as the basis thereof. The Department states that these issues present a case of first impression in South Carolina, and we are inclined to agree. In support of its contentions the Department cites a number of cases from other jurisdictions, some of which are clearly not in point. We shall not undertake to review all of these since we do not find any of them very helpful.

While we are not aware of any South Carolina case precisely in point, there are well established principles which point clearly to the solution of these issues. There are, of course, no formal pleadings in a condemnation case. The issues are to a large extent formed by the evidence. Nevertheless, in any condemnation case it behooves both the condemnor and the condemnee to join the issues as fully as such can be done, in advance of the trial, by ascertaining just what construction the condemnor proposes so that the resulting damages may be properly appraised and the case prepared for trial. Due to the complicated nature of the present case, both the landowner and the trial judge made diligent effort to join all the issues well in advance of the trial. The judge, recognizing the importance of the case, its probable length and difficulties, set a special term for its trial, and held a pretrial conference nine days before the commencement of the term, obviously for the purpose of joining the principal issues so that the trial of the case could be expedited.

The attempt of the Highway Department in the course of the trial to inject evidence as to various matters proposed, but not included in the plans agreed upon as a basis of trial, was tantamount to amending what, in practical effect, served the purpose of pleadings in the instant case. Certainly it was an effort to amend and substantially change the issues.

"Generally the allowance of an amendment to a pleading is a matter largely in the discretion of the trial court. Such discretion should not be arbitrarily exercised, either in the

granting or refusing of motions made for that purpose, but should be exercised so as to prevent surprise and promote justice. Unless there has been an abuse of this discretion, this court will not ordinarily disturb the exercise thereof by the trial court. During a trial, the court may allow an amendment to conform the pleading to the facts proved, provided such amendment does not change substantially the claim or defense of the party seeking the same. *Grist et al. v. Caldwell, et al.,* 123 S. C. 240, 116 S. E. 448." *Continental Radio and Television Corp. v. Furman,* 193 S. C. 357, 8 S. E. (2d) 902.

"Ordinarily, the conduct of a trial, including the admission and rejection of testimony, is largely within trial judge's sound discretion, exercise of which will not be disturbed unless abuse of such discretion, commission of legal error in its exercise, and resulting prejudice to appellant's rights, can be shown." *Fetner v. Aetna Life Insurance Co.,* 199 S. C. 79, 18 S. E. (2d) 521; *Chastain v. United Insurance Co.,* 230 S. C. 465, 96 S. E. (2d) 464.

We are of the opinion that the trial judge soundly exercised his discretion in excluding the proffered testimony, and in refusing to allow the Department to, in effect, amend the issues in the course of the trial. His discretion was properly exercised so as to prevent surprise and, we think, promote justice.

Assuming, without deciding, that the witness for the Highway Department could bind the Department to all of the proposed changes, he, of course, could not bind the railroad where the property of the railroad was concerned. Under all of the circumstances reflected by the record, if the Department deemed that the proposed changes, as to which it proffered evidence on the trial, would diminish the damages sustained by the landowner, it should have, in fairness to the court and the landowner, furnished either amended plans, or reasonably specific and binding information, to both the court and the landowner in advance of the trial to the end that proper trial preparations might be made ac-

cordingly and the trial expedited. It is obvious that the determination of the effect of this condemnation and consequent damages required long, expensive, arduous and intensive preparation. The presentation of the case to the jury in an understandable manner was, at best, a tedious task. The appraisals on behalf of the landowner were prepared without the benefit of knowledge of any proposed changes by the Department. Even the Department's appraisers were unaware of all the matters sought to be injected by the Department. Under these circumstances, the admission of the excluded evidence would, of necessity, have led to confusion. As the trial judge aptly stated, some jurors would have been thinking about apples, while others were thinking of oranges.

In holding that there was no abuse of discretion in the exclusion of evidence, we, of course, do not hold that a condemnor can, under no circumstances, offer evidence as to actual construction and its effect upon the issue of damages, even though not shown in detail on the plans. We hold simply and only that under the circumstances of this case, there was no abuse of discretion on the part of the trial judge.

With respect to the motion for a mistrial, the Department concedes that the general rule is that the granting of a motion for a mistrial by reason of anything occurring during the trial of the case is within the sound discretion of the trial judge and that his ruling thereabout will not be disturbed unless there has been an abuse of discretion. *Gordon v. Rothberg,* 213 S. C. 492, 50 S. E. (2d) 202; *Wynn v. Rood,* 228 S. C. 577, 91 S. E. (2d) 276.

Under all of the circumstances reflected by the record, we are satisfied that there was no abuse of discretion on the part of the trial judge in refusing the motion for a mistrial. No authority is cited, and we are aware of none, for the proposition that a mistrial should be ordered because the trial judge refuses to allow a litigant to change the issues in the course of a trial.

The Department contends that His Honor erred in allowing one Gordon Henderson to testify as to the damages, he not being the owner of the property or qualified as an expert witness. Henderson was assistant secretary and executive manager of Buckfield Plantation. He was thoroughly familiar with the characteristics, nature and use of the plantation, improvements made thereon under his supervision, the manner in which the highway construction would affect or damage the property and the use thereof. He was in charge of the purchasing of the plantation for the present landowner and also purchased for it contiguous land and other land in the vicinity. Respondent concedes that Henderson was, of course, not the owner of the land and that the mere fact that he was an officer of the corporation would not qualify him to testify as to the value of the property. He was presented, however, simply as a witness who was thoroughly familiar with the property, its use and its value.

"Generally, the best available proof of what land is worth is the opinion of those who know enough of the factors, which must be a basis of the opinion, to express their judgment about it." *Miller v. Parr Shoals Power Co.*, 104 S. C. 129, 88 S. E. 374. See also *Kean v. Landrum*, 72 S. C. 556, 52 S. E. 421, and *S. C. Public Service Authority v. Spearwant Liquidating Co.*, 196 S. C. 481, 13 S. E. (2d) 605. We are satisfied that the testimony of Henderson was competent and there was no error on the part of the trial judge in admitting it.

The only other contention made is that the court erred in identifying certain of the Department's requests, which were properly charged, as being requests of the Department. Several courts have criticised the practice of identifying the source of a request to charge and stated that the better practice is to refrain from characterizing an instruction as one given at the request of a particular party. See 53 Am. Jur. 431, Trial, Sec. 538, and 88 C. J. S., Trial, § 411 (c), p. 1129. No court, however, has

apparently held that the mere identification of the source of a request to charge, without more, constitutes reversible error. Whatever may be deemed the better practice in this respect, the Department here fails to point out any possible prejudice to it, and the exception raising this question is, therefore, without any merit.

Having concluded that all exceptions are without merit, the judgment of the lower court is, accordingly,

Affirmed.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.